FILED

2014 Jul-18  AM 08:49
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ALBERT J. ISAAC and | ) |
| ROSETTA W. ISAAC, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | )          Case No. 2:12-cv-2030-TMP |
| | ) |
| RMB, INC., and | ) |
| CLOUD & TIDWELL, LLC, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

Following a non-jury bench trial of the plaintiffs' claims under the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 *et seq.*, the court makes the following Findings of Fact and Conclusions of Law.  Much of the evidence was stipulated by the parties

### I.  Findings of Fact

1.  The plaintiffs are husband and wife, residing together in their family home.  They do not know anyone named Elva Whitman or Elva Washington.  They do not owe a debt for or on behalf of anyone by those names.

2.  Mr. Isaac suffers from diabetes, diagnosed in 2008, which he controls with diet, exercise, and avoiding stress.  Stress causes his blood glucose to rise, making his diabetes worse.

3.  The defendant, Cloud & Tidwell, LLC, was, during the relevant time period, a law firm specializing in debt collection.  The principals in the firm were Brian Cloud and Jay Tidwell.  The firm employed a number of people to make debt collection calls and otherwise

manage collection of debts referred by clients.  The firm received approximately 1,400 to 1,500 new collection accounts each month.

4.   Cloud & Tidwell has employed a Director of Compliance since at least 2010 to provide training to employees and to monitor their compliance with the Fair Debt Collection Practices Act ('FDCPA").   Training involves a 90-minute video presentation as well as classroom instruction.   Each employee must take and score 100% on a test of his or her knowledge of the FDCPA before he or she is allowed to make collection calls.  All employees undergo retraining annually.

5.   During July 2011, Cloud & Tidwell received a collection account from a creditor client relating to a consumer debt owed by a person known as Elva Whitman or Elva Washington.  Although the information forwarded by the client included a telephone number matching that of the plaintiffs, the name, address, and other information identifying the debtor made no mention of the plaintiffs, and it is agreed by the parties that the plaintiffs have no responsibility for the debt allegedly owed by Elva Whitman or Elva Washington.

6.   As was its standard practice, Cloud & Tidwell forwarded the collection-account information to an outside vendor to perform a "scrub," which entails comparing the name, address, telephone number, and Social Security number of the debtor (Elva Whitman or Elva Washington) to several databases, looking for changes of address, a listing on the Social Security Death Index, and any bankruptcy filings by the debtor.  If no information is found, the vendor mails a collection letter to the debtor at the address supplied by the client.  In this case, a letter was mailed to Elva Whitman at the address supplied by the client.  Because the letter was sent to the address of Elva Whitman, plaintiffs did not receive a copy of it.

7.   Beginning on July 25, 2011, Cloud & Tidwell began making telephone calls to the

plaintiffs' home telephone, believing it to be Elva Whitman's number.

8.   At that time, Cloud & Tidwell used a web-based automated dialer called Livevox. The purpose of the dialer was to dial many numbers, in order to keep collection callers busy talking to debtors.  When an automated call was answered by a live person, the dialer connected the call to a collection employee of Cloud & Tidwell to discuss payment of the debt owed.  If the automated dialer was answered by voice mail or an answering machine, it automatically disconnected the call.  The Livevox software determined whether a live person answered by how long the answering party's greeting lasted.  If a pause did not follow a relatively short greeting, the software was programmed to treat the call as if it had reached voice mail or an answering machine and disconnect the call.

9.   Although plaintiffs began receiving calls on July 25, 2011, they never spoke to a live person.  Mr. Isaac's manner of answering the telephone – using a long greeting in which he indicated that the call might be recorded – apparently (but unknown to Mr. Isaac) tricked the Livevox software into determining that it had reached a recording machine or voice mail, causing it to disconnect the call.  As a result, the plaintiffs received a "hang-up" call almost daily, first for a few days in late July 2011, and then again for several weeks from late January to April 2012.

10.   On July 29, 2011, the Isaacs wrote and mailed the following letter to Cloud & Tidwell:

TO WHOM IT MAY CONCERN:

Albert J. Isaac, and/or Rosetta W. Isaac do not owe any monies to Cloud & Tidwell, LLC, or any client(s) of Cloud & Tidwell, LLC, nor do we have any account.  Cloud & Tidwell, LLC telephone calls, that causes our residential telephone (205)836-3075 to ring, is very annoying, intrusive, and an invasion of our privacy.  Upon Cloud & Tidwell, LLC receipt of this cease communication

letter, we want Cloud & Tidwell, LLC to stop calling our residential telephone (205)836-3075.

       Should Cloud & Tidwell, LLC continue to cause our residential telephone to ring, hang up when the call is answered, contact us by telephone for conversation, and/or leave us any voice mail messages.  We will perceive these acts to be hostile, with the intent to harass us.

Cordially,

Albert J. Isaac
Rosetta W. Isaac

(All as in original).

    11.   The letter was mailed by certified mail and received by Cloud & Tidwell on August 1, 2011, as shown by Brian Cloud's signature on the postal receipt.  Cloud & Tidwell stipulates that it received the letter on August 1, 2011.

    12.  Cloud & Tidwell processed the letter by attempting to match it to an account number for a debtor in the firm's system.[1]  Because the letter did not refer to Elva Whitman or Elva Washington or an account number (because plaintiffs' were unaware of this information), it took Cloud & Tidwell until August 4, 2011, to match it to the plaintiffs' telephone number, which was then put on a "do not call" list.  Calls to the plaintiffs stopped on August 4, 2011.

    13.   In January 2012, the creditor client who originally sent the Elva Whitman account to Cloud & Tidwell forwarded the same account to Cloud & Tidwell a second time.  The collection account sent to defendant in January was a duplicate of the account that had been sent the previous July, having the same debt, debtor, address, and other identifying information.  It was part of a batch of 1,500 accounts sent to Cloud & Tidwell in the month of January 2012.

---

[1]   In reaching this finding, the court finds no credibility in the testimony of Brian Cloud. Despite his trial testimony that the letter was received and processed, he filed an affidavit in support of an earlier motion for summary judgment in which he testified that the letter was "misplaced."  He has offered no credible explanation for these two very different versions of events.

14. Upon receipt, Cloud & Tidwell again sent the account for "scrubbing," but because the scrubbing process did not involve comparing telephone numbers to ones previously put on a "do not call" list, the duplicate nature of the information was not detected. Again, the plaintiffs received no collection letter because the account was not theirs and did not involve their address, only their telephone number.

15. On January 24, 2012, collection calls to the plaintiffs began again. As before, these calls were initiated by the Livevox automated dialer, which lacked any feature for comparing "do not call" numbers to those associated with accounts. After this action was filed, Cloud & Tidwell began using a different automated dialer (TCN software) which cross-references telephone numbers on a "do not call" list to those supplied by creditors for potential debtors. With this system, once a telephone number is identified as a "do not call" number, the automated dialer will not dial the number even if it is re-programmed into the system as a contact for a potential debtor.

16. Between January 24 and April 16, 2012, when they stopped, plaintiffs received in excess of 40 calls from Cloud & Tidwell, none of which resulted in the plaintiffs speaking to a live caller. The vast majority were "hang up" calls, which were disconnected when answered by the Isaacs, and there were four other calls involving inaudible voice messages.

17. On February 16, 2012, an employee of Cloud & Tidwell left the following voice message on the plaintiffs' answering machine:

> Hello, this message is for Elva Whitman. Please return the call to Barry at the law firm of Cloud & Tidwell in Birmingham. It is important that you do so. The number is 866 728 2098, extension 124. Thank you.

Plaintiffs did not return the call, nor did they otherwise communicate to Cloud & Tidwell that

they did not know Elva Whitman or owe her debt.

18.   During the timeframe from July 2011 to April 2012, Cloud & Tidwell placed over 110,000 collection calls on all accounts held for collection purposes.  Of those, 6,000 calls were for the client who placed the Elva Whitman account with Cloud & Tidwell for collection.

19.   Prior to January 2014,[2] only two explicitly stated regulations or procedures of Cloud & Tidwell existed for handling mis-identified or wrong telephone numbers or requests that calls cease, and these were paragraphs 5 and 6 of the "House Rules," as follows:

> **5) Wrong Numbers:**  Whenever advised that a number called is not the correct number for the party we are looking for, collectors MUST remove that number from the account or mark it invalid.
>
> **6) Do Not Call Requests (DNC's):**  Whenever advised that a debtor does not want to receive anymore calls, the account must be notated as such with the "Do Not Call" warning enabled and statused appropriately.

(Plaintiff's Exhibit 1, "Cloud & Tidwell Collections Policy and Procedures Guide," revised May 2011).

## II.  Conclusions of Law

This case went to trial on two remaining claims by the plaintiffs: (1) that the defendant continued to make collection calls to their home after being notified to cease, in violation of 15 U.S.C. § 1692c(c); and (2) that defendant placed a call to plaintiffs' home and left a message without disclosing that the call was being made by a debt collector for the purposes of debt

---

[2]   Part of Plaintiff's Exhibit 1 also contains the "Cloud & Willis, LLC Omnibus Policies and Procedures," Version 2.1, revised January 2014.  It is unclear what parts of this, if any, were in existence in 2011 or 2012, but it would appear that these "Policies and Procedures" replaced the "Cloud & Tidwell Collections Policy and Procedures Guide" sometime after the events involving the Isaacs.

collection, in violation of 15 U.S.C. § 1692e(11).  Defendant stipulated to the facts that calls were made after it received notification to cease in the form of the plaintiffs' July 29 letter, and that an employee of the defendant left a voice mail or answering-machine message on the plaintiffs' telephone without making the required debt-collector disclosure.  Defendant argued two issues in defense: (1) that the plaintiffs do not have standing to assert a claim under the Fair Debt Collection Practices Act because they are not "consumers" within the definition used in the statute[3]; and (2) the calls made to the plaintiffs were *bona fide* errors that occurred despite "the maintenance of procedures reasonably adapted to avoid any such" errors, consistent with 15 U.S.C. § 1692k(3).

### A.  Standing

The defendant argues that, under 15 U.S.C. §§ 1692c(c) and 1692e(11), the plaintiffs are not within the statutory definition of "consumers" and thus lack standing to bring this action.  The defendant further asserts that this lack of standing deprives the court of subject matter jurisdiction.  The argument was raised for the first time after the presentation of the plaintiffs' evidence at trial.  It was raised again after the conclusion of all evidence.  Because defendant asserts this standing argument as a challenge to the court's subject-matter jurisdiction, it is addressed first.

At the outset, the court notes that it appears that defendant did not preserve this argument for trial.  Although a nonspecific defense regarding standing was raised in the answer, and an entirely different standing argument was raised in the motion for summary judgment, this

---

[3] This defense was raised for the first time in the defendant's motion for judgment as a matter of law filed at the conclusion of the plaintiffs' case in chief at trial.  It was not argued in defendant's motion for summary judgment, nor was it preserved in the pretrial order.  Affirmative defense 21 in Cloud & Tidwell's answer does assert that plaintiffs lack standing, without any further explanation or basis for the defense.  It does not explicitly assert that the plaintiffs are not "consumers" within the meaning of the statute.

argument relating to the Isaacs' status as "consumers" was presented for the first time during trial.  To the extent that the defendant argues standing *other* than as required for subject-matter jurisdiction, the argument has not been preserved.  It was not presented at the pretrial conference or made part of the pretrial order (doc. 85).  It is well settled that a failure to "identify the issue to the court at the pretrial conference, regardless of whether the issue is a legal or factual one," may result in waiver.  Morro v. City of Birmingham, 117 F.3d 508, 516 (11th Cir. 1997) (noting that having the plaintiff and the court "blindsided" or "ambushed" is "precisely what the pretrial conference and order are designed to avoid").

The fact that the defendant failed to preserve for trial the issue of whether the plaintiffs had standing as "consumers" is further supported by the court's Memorandum Opinion resolving plaintiffs' and defendant's motions for summary judgment, in which the court noted that "none of the parties dispute that Mr. and Mrs. Isaac are consumers and that RMB and Cloud & Tidwell are debt collectors as defined in 15 U.S.C. §1692a(3) and (6)."  (Doc. 73, p. 12).  Not only did the defendant not argue this issue on summary judgment, it did not file any motion to reconsider or otherwise attempt to object or preserve any error on that issue.  Insofar as defendant raises the argument to point out a defect in the merits of the plaintiffs' case, it was not preserved for trial, was waived by the defendant, and cannot now be asserted as a defense to the merits of the case.

Defendant argues that the standing question deprives the court of subject-matter jurisdiction, which is an issue that can be raised at any time prior to judgment regardless of whether it was preserved in earlier stages of the litigation.  Here, the court addresses the standing argument only as a subject-matter jurisdiction challenge.

The Supreme Court has designed a framework for resolving standing issues, which involves both "constitutional" and "prudential" requirements.  Harris v. Evans, 20 F.3d 1118,

1121 (11th Cir. 1994), citing <u>Warth v. Selden</u>, 422 U.S. 490, 498−99, 95 S. Ct. 2197, 2205 (1975); <u>Saladin v. City of Milledgeville</u>, 812 F.2d 687, 690 (11th Cir. 1987).  To meet the "irreducible minimum" requirements of Article III constitutional standing, a plaintiff must demonstrate: (1) that he has suffered an actual or threatened injury, (2) that the injury is fairly traceable to the challenged conduct of the defendant, and (3) that the injury is likely to be redressed by a favorable ruling.  <u>Harris</u>, 20 F.3d at 1121, citing <u>Warth</u>, 422 U.S. at 498-99.   By demonstrating that the plaintiffs received debt collection calls from Cloud & Tidwell that interrupted their meals or rests, and which caused Mr. Isaac's blood glucose to rise, resulting in his becoming anxious and angry, the plaintiffs have proven that they meet the irreducible minimum requirements of constitutional standing.  They suffered an actual injury fairly traceable to the conduct of the defendant, which is redressable by an award of compensatory damages.

Beyond the constitutional requirements of standing, there are judicially developed prudential standing considerations, which are intended to self-restrain the courts to a properly limited role in a democratic society. The Eleventh Circuit Court of Appeals has described prudential standing as a doctrine essential to preserving the American system of government:

> In addition to these constitutional requirements, the court has fashioned three principles of judicial restraint, which have come to be known as "prudential" considerations.  These self-imposed constraints are intended to ensure the proper role of the courts in our tripartite system of government by avoiding judicial resolution of abstract questions that would be more appropriately addressed by other governmental institutions.  <u>Warth</u>, 422 U.S. at 500, 95 S. Ct. at 2205−06.  We have summarized the three prudential considerations as follows:
>
> > 1) whether the plaintiff's complaint falls within the zone of interests protected by the statute or constitutional provision at issue;
> >
> > 2) whether the complaint raises abstract questions amounting to generalized grievances which are more appropriately resolved by the legislative branches; and

> 3) whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.

Harris, 20 F.3 at 1121 (quoting Saladin, 812 F.2d at 690). In this case, the issue raised --- to the extent that the defendant argues a lack of prudential standing --- is whether the Isaacs fall "within the zone of interests protected" by the FDCPA. Defendant contends that because the Isaacs were not a debtor Cloud & Tidwell was trying to find, they are not "consumers" within the protections of the FDCPA, and, therefore, are not within the "zone of interests protected" by the statute. For reasons discussed below, the court disagrees.

First, the court disagrees that the status of being a "consumer" as defined by § 1692a(3) implicates the court's jurisdiction.[4] Although there may be some question whether the Isaacs can state a claim under some parts of the FDCPA, this does not mean that the court has no jurisdiction in the case. Despite using the term "standing," it is not a jurisdictional question. Second, the court disagrees that the Isaacs were not "consumers" within the meaning of the statute simply because they did not owe any debt that Cloud & Tidwell was trying to collect. It is undisputed that the Isaacs were not the debtor Cloud & Tidwell was seeking (Elva Whitman was), but it is undisputed also that Cloud & Tidwell believed the Isaacs' telephone number was somehow associated with Elva Whitman, as they called that number repeatedly looking for her. In a very real way, Cloud & Tidwell "alleged" (mistakenly) that a person at the Isaacs' telephone number owed a debt to their client.

The purpose of the FDCPA is to "eliminate abusive debt collection practices by debt collectors, to insure that those debt collectors who refrain from using abusive debt collection

---

[4] See 15 U.S.C. § 1692a(3), which defines the term consumer as "any natural person obligated or allegedly obligated to pay any debt."

practices are not competitively disadvantaged, and to promote consistent State action to protect consumers against debt collection abuses." 15 U.S.C. §1692(e).  Section 1692a(3) defines as a consumer covered under the protections of the Fair Debt Collection Practices Act "any natural person obligated or allegedly obligated to pay any debt."  More broadly, the remedial provision of the FDCPA that authorizes a civil action provides that "any debt collector who fails to comply with *any provision* of this subchapter with respect to *any person* is liable to such person...." 15 U.S.C. § 1692k(a) (emphasis added); see Drossin v. National Action Financial Services, Inc., 255 F.R.D. 608, 612 (S.D. Fla. 2009) ("[B]ecause the FDCPA is designed to protect consumers, it is liberally construed to effect its purpose.").  The term "consumer" includes those who both owe a debt and who are "alleged" to owe a debt.  Here, plaintiffs received more than 50 telephone calls, all but one of which were inaudible or hang-up calls in which the plaintiffs never spoke to anyone.  It was only in the February 16, 2012, voice message that it became clear to the Isaacs that defendant was looking for someone named Elva Whitman.  Before that call, plaintiffs had no way of knowing that Cloud & Tidwell did not allege that *they* owed a debt.  Indeed, under the "least sophisticated consumer" test, upon receiving dozens of telephone calls, they had every reason to believe that defendant *did* allege that they owed a debt.  Similar to the mistaken identity calls involved in Drossin v. National Action Financial Services, *supra*, "[T]here was no way for Plaintiff[s] to know that [calls were] not intended for [them], but rather [Elva Whitman]. Therefore, from the 'least sophisticated consumer' perspective, it is reasonable that Plaintiff[s] thought [they were] the person who allegedly owed the debt and thus [were] the consumer." Drossin v. National Action Financial Services, Inc., 255 F.R.D. 608, 612 (S.D. Fla. 2009).  The plain language of the statute and a fair reading of its purpose compel the conclusion that the

Isaacs are within the zone of interests protected by the FDCPA – the statutory right to be free from abusive debt collectors.

### 1. *"Consumer" Definition in § 1692a(3) is not Jurisdictional*

The crux of the defendant's argument is that plaintiffs lack "standing" because they do not meet the definition of being a "consumer" contained in § 1692a(3), and that this lack of standing implicates the court's subject-matter jurisdiction. This conclusion is important to the defendant because challenges to subject-matter jurisdiction are not waivable or forfeitable. As already noted above, defendant raised this argument for the first time in motions for judgment as a matter of law at the conclusion of the plaintiffs' case in chief; it was not clearly pleaded in the answer and certainly was not preserved in the pretrial order. If, in fact, the issue is jurisdictional, that does not matter; but if it is not jurisdictional, but simply an element of a particular claim by the plaintiffs, the question is whether the defendant's fairly raised the issue in the middle of trial.

In light of the Supreme Court's recent emphasis on the distinction between jurisdictional questions and questions merely about the merits or proof of a claim, the court does not believe that fitting the definition of being a "consumer" under § 1692a(3) is jurisdictional, despite courts having termed it as a "standing" issue. In Arbaugh v. Y&H Corporation, 546 U.S. 500, 126 S. Ct. 1235, 163 L. Ed. 2d 1097 (2006), the Court noted "the distinction between two sometimes confused or conflated concepts: federal-court 'subject-matter' jurisdiction over a controversy; and the essential ingredients of a federal claim for relief." Id. at 503, 126 S. Ct. at 1238. In that case, the issue was whether the 15-employee requirement of Title VII was jurisdictional or merely an element of the claim that must be proven to prevail. The Court found it was the latter. Noting that the jurisdictional provisions of Title VII make no reference of the employee-numerosity requirement, the Court expressed the following test:

If the Legislature clearly states that a threshold limitation on a statute's scope shall count as jurisdictional, then courts and litigants will be duly instructed and will not be left to wrestle with the issue….  But when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character.  Applying that readily administrable bright line to this case, we hold that the threshold number of employees for application of Title VII is an element of a plaintiff's claim for relief, not a jurisdictional issue.

Arbaugh v. Y&H Corporation, 546 U.S. 500, 515-16, 126 S. Ct. 1235, 1245, 163 L. Ed. 2d 1097

(2006) (internal citations and footnotes omitted).

A few years later, in Henderson ex rel. Henderson v. Shinseki, ___ U.S. ___, 131 S. Ct.

1197, 1202, 179 L. Ed. 2d 159 (2011), the Supreme Court again addressed whether a rule

imposing a time limit on appeals from the Veterans Administration is "jurisdictional," and the

Court wrote:

Because the consequences that attach to the jurisdictional label may be so drastic, we have tried in recent cases to bring some discipline to the use of this term.  We have urged that a rule should not be referred to as jurisdictional unless it governs a court's adjudicatory capacity, that is, its subject-matter or personal jurisdiction. Reed Elsevier, supra, at ____, 130 S. Ct., at 1243–1244; 1203 Kontrick, supra, at 455, 124 S. Ct. 906.  Other rules, even if important and mandatory, we have said, should not be given the jurisdictional brand.  See Union Pacific, 558 U.S., at ___, 130 S. Ct., at 596.

Henderson ex rel. Henderson v. Shinseki, ___ U.S. ___, 131 S. Ct. 1197, 1202-03, 179 L. Ed. 2d

159 (2011).   The Court reiterated the rule in Arbaugh, that unless there is a clear indication that

Congress wanted a particular coverage limitation to be jurisdictional, it would be treated only as

a "claims-processing" rule or an element of the claim itself, not as affecting the court's

fundamental adjudicatory capacity.  Id. at ___, 131 S. Ct. at 1203.

Notwithstanding the use of the term "standing" and its connotations related to subject-

matter jurisdiction, the court does not believe that whether a particular plaintiff can meet the definition of being a "consumer" under § 1692a(3) of the FDCPA is jurisdictional.  First, the express jurisdictional provision of the FDCPA, § 1692k(d), makes no reference whatsoever to the requirement that only "consumer" may invoke the statute.  It simply states that an action to enforce liability under the Act can be brought in any appropriate United States District Court, without regard to the amount in controversy.  Thus, there is no clear indication from Congress that the court's jurisdiction to adjudicate a claim is conditioned upon the plaintiff meeting that status.  Second, courts have recognized that some parts of the Act simply do not refer to the "consumer" definition as a condition of the right of action.  For example, courts have held that the provisions found at § 1692e apply regardless of whether the plaintiff is a "consumer."  See footnote 5, *infra*.  If being a "consumer" within the meaning of § 1692a(3) were jurisdictional, it would condition the right of suit under the entire Act, not just parts of it.  The court concludes, therefore, that despite cases referring to § 1692a(3) as a "standing" provision, it should not be understood as establishing a jurisdictional impediment to suit.  To the extent that a plaintiff must meet the definition, it is simply a part of the requirements of proof on the merits, similar to the employee-numerosity requirement for an action under Title VII.

### 2. *Alleged Failure to Prove an Element of the Claim*

Defendant conflates the jurisdictional requirement of standing with the nonjurisdictional requirement that the plaintiffs prove every element of their claim.  As discussed *supra*, the constitutional requirement of standing requires no more than that: (1) the plaintiff must have suffered an actual or imminent injury, or a concrete "invasion of a legally protected interest"; (2) that injury must have been caused by the defendant's complained-of actions; and (3) the plaintiff's injury or threat of injury must likely be redressable by a favorable court decision.

Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). This minimal requirement of standing is no doubt met here, where the FDCPA created a legally protected interest to be free from abusive practices by debt collectors, and the defendant debt collector admittedly called plaintiffs more than 40 times after receiving the cease-and-desist letter and left a voice message without the required disclosures. In this case, the court has the requisite subject-matter jurisdiction under 28 U.S.C. § 1331 that provides the power to adjudicate these claims. As the Supreme Court reiterated:

> Even though decisions since *Tennessee Electric* have been careful to use the terms "cause of action" and "standing" with more precision, the distinct concepts can be difficult to keep separate. If, for instance, the person alleging injury is remote from the zone of interests a statute protects, whether there is a legal injury at all and whether the particular litigant is one who may assert it can involve similar inquiries. *Steel Co. v. Citizens for Better Environment,* 523 U.S. 83, 96–97, and n. 2, 118 S. Ct. 1003, 140 L. Ed. 2d 210 (1998) (noting that statutory standing and the existence of a cause of action are "closely connected" and "sometimes identical" questions).

Bond v. United States, ___ U.S. ___, 131 S. Ct. 2355, 2362, 180 L. Ed. 2d 269 (2011). Plainly, the Isaacs were not "remote" from the zone of interests protected by the statute: they received calls from a debt collector notwithstanding notifying the collector not to call. They suffered a real and concrete injury, not a remote or hypothetical injury.

Defendant asserts that the Isaacs are not entitled to recover because they failed to meet their burden of proving on the merits of their claim that they are "consumers" within the definition of the statute. The defendant argues that, because the Isaacs did not owe the debt that Cloud & Tidwell was actually attempting to collect, they were not "consumers." This argument is based on the perverse notion that people who actually owe a debt and are harassed by debt collectors are protected by Congress's legislation, but those who do *not* owe the debt – who are

called in error − and are harassed by debt collectors repeatedly dialing the wrong number have no remedy under the FDCPA.

First, it must be noted that the claims at issue in the trial were that Cloud & Tidwell violated 15 U.S.C. § 1692c(c) by placing calls to the Isaacs after they had sent defendant a cease-and-desist letter, and that the defendant violated 15 U.S.C. § 1692e(11) by leaving a message on the Isaacs' answering machine that did not include any disclosure that the caller was a debt collector.[5]  The Eleventh Circuit Court of Appeals has not squarely addressed whether a non-debtor can be considered a consumer under the FDCPA.  However, a district court within the circuit examined a similar issue when a non-debtor who received abusive phone calls sued under 15 U.S.C. 1692c(b) and 1692d.  In Whatley v. Universal Collection Bureau, Inc., 525 F. Supp. 1204 (D.C. Ga. 1981), the court noted:

> The second part of defendant's motion for partial summary judgment poses the question whether only the "consumer," Russell W. Whatley, who is the person

---

[5]  The court notes here that a number of courts have concluded that actions under § 1692e are not subject to any limitations regarding "consumers."  Although § 1692e(11) refers to written and oral communications with "the consumer," this does not limit the persons who may sue on the basis of a misleading or deceptive debt collection practice.  "Reading this provision in conjunction with § 1692k(a), courts have properly interpreted § 1692e to mean that 'any aggrieved party' may bring an action under the provision."  Rawlinson v. Law Office of William M. Rudow, LLC, 460 F. App'x 254, 258 (4th Cir. 2012) citing Montgomery v. Huntington Bank, 346 F.3d 693, 697 (6th Cir. 2003) (quoting Wright v. Fin. Serv. of Norwalk, Inc., 22 F.3d 647, 649–50 (6th Cir.1994)); see also Beck v. Maximus, Inc., 457 F.3d 291, 294 (3rd Cir. 2006) (noting that the FDCPA "is intended to protect both debtors and non-debtors from misleading and abusive debt-collection practices").  Thus, where Cloud & Tidwell were intending and attempting mistakenly to make an oral communication with Elva Washington, the purported debtor and "consumer," any person aggrieved by the defendant's failure to make the required disclosure can bring an action.  Here, the Isaacs were aggrieved because they received the message that lacked the disclosure it was from a debt collector.  Lacking the disclosure, they were deceived as to the nature of the call asking them to telephone the Cloud & Tidwell law firm.  They could not know, and were not informed, whether it involved a debt-collection matter or some other legitimate business or legal matter upon which a law firm might be calling them.

"obligated or allegedly obligated" to pay the debt, 15 U.S.C. § 1692a(3), has standing to sue under the Act.  This is a question of first impression.  The Court answers this question in the negative.

To answer the question, the Court need go no further than to examine the words and plain meaning of the statute.  Plaintiffs, Russell Whatley and his parents, allege that one of defendant's agents threatened them over the phone in connection with defendant collection agency's attempts to recover Russell Whatley's debt to defendant J.C. Penney Company, Inc.  If proven, the threat would violate, at a minimum, 15 U.S.C. § 1692c(b) and 15 U.S.C. § 1692d.  See plaintiffs' complaint, P 7.  The threat was allegedly left on the home recording device of the Whatley family residence.

The civil liability portion of the Act provides that "any debt collector who fails to comply with any provision of this subchapter with respect to *any person* is liable to such person..." 15 U.S.C. § 1692k(a) (emphasis added).  The liability section is couched in the broadest possible language; the statute is not limited to "consumers."  Moreover, a number of violations proscribed by the Act harm persons other than consumers.  Defendants' contention that plaintiff parents lack standing to sue under the Act leads to the absurd conclusion that Congress created a piece of consumer protection legislation with a 'private attorneys general' enforcement mechanism, and then failed to provide persons harmed by unfair debt collection practices with a cause of action.  The argument is untenable.  There are certainly no policy reasons consistent with the Act that support the argument.  Accordingly, this Court holds that "any person," as used in 15 U.S.C. § 1692k(a) includes persons, such as Dorothy and William Whatley, who claim they are harmed by proscribed debt collection practices directed to the collection of another person's debt.

525 F. Supp. at 1205-06 (footnotes omitted).  But see Kaniewski v. National Action Financial

Services, 678 F. Supp. 2d 541 (E.D. Mich. 2009) (barring recovery by one who *knows* he does

not owe the debt).[6]  Although the decision in Whatley has been criticized in other circuits, the

court finds that the reasoning behind that decision remains sound and should apply to § 1692c(c)

as well.

---

[6]  The Kaniewski decision can be distinguished from the instant case because the Isaacs did not *know* they did not owe an alleged debt.  They did not know why Cloud & Tidwell was calling, or that, at the very least, Cloud & Tidwell did not *allege* that they owed a debt.

At least four other circuits have concluded that the FDCPA provides protection to non-debtors mistakenly dunned by a debt collector.  See Bridge v. Ocwen Fed. Bank, FSB, 681 F.3d 355, 362 (6th Cir. 2012); Dunham v. Portfolio Recovery Associates, LLC, 663 F.3d 997, 1001 (8th Cir. 2011); Beck v. Maximus, Inc., 457 F.3d 291, 293 (3d Cir. 2006); see also Todd v. Collecto, Inc., 731 F.3d 734 (7th Cir. 2013).  For example, in Dunham, a debt collector, by mistake, attempted to collect debt not owed by the plaintiff but by someone with a similar name.  The debt collector argued that because Dunham was not the *actual* debtor, he was not a "consumer" within the meaning of the FDCPA.  The Eighth Circuit rejected this argument, saying:

> Simply put, a mistaken allegation is an allegation nonetheless. Thus, we read § 1692a(3) to include individuals who are mistakenly dunned by debt collectors.
>
> The Federal Trade Commission (FTC) Commentary supports this conclusion.  In its Staff Commentary, the FTC states that "[a] debt collector must verify a disputed debt even if he has included proof of the debt with the first communication, *because the section is intended to assist the consumer when a debt collector inadvertently contacts the wrong consumer at the start of his collection efforts*."  FTC Staff Commentary, 53 Fed. Reg. 50097–02, 50106 (Dec. 13, 1988) (emphasis added).

Dunham v. Portfolio Recovery Associates, LLC, 663 F.3d 997, 1002 (8th Cir. 2011).  Likewise, in Beck, a debt collector, confusing the plaintiff with another woman with a similar name who was the true debtor, sent an employment verification request to plaintiff's employer, indicating that she owed a debt.  Even though plaintiff did not owe any debt to the collector, the Fourth Circuit found she was protected by the act also.  The court reasoned that the debt collector "alleged," even if mistakenly, that plaintiff owed a debt by seeking employment information from her employer, and that was sufficient to meet the definition of consumer in § 1692a(3).

Defendant urges this court to follow the reasoning in another case decided in the Northern District of Alabama, which limited the definition of "consumer" strictly to persons who actually owed the debt being collected. Stinson v. Receivables Management Bureau, Inc., 2013 WL 1278966 (N.D. Ala. March 26, 2013). The plaintiff in Stinson filed an action against a debt collector who had called his home more than 100 times to collect a debt owed to St. Vincent's Hospital by another person who had stayed in Stinson's house briefly and had provided Stinson's phone number on his hospital records. Stinson was seeking a remedy under 15 U.S.C. §1692d(5) for intentional harassment, and under §1692c(b)[7] for "conveying information regarding a debt directly or indirectly to any person." 2013 WL 1278966 at *6. In that case, arising under different provisions of the FDCPA than this case, Stinson had never notified the debt collector that he was not the debtor, nor had he told the debt collector to stop calling him.

---

[7] The court correctly noted that the FDCPA provision cited by plaintiff was a definition, and not a claim, but also recognized that, to the extent that the count stated a claim under §1692g(a), the plaintiff did not have standing because he was not a consumer. Plaintiff may have been attempting to raise a claim that the debt collector violated § 1692c(b) by communicating with a third party about the debts of another, recovery for which logically is limited to the debtor, who debt information is conveyed to another, and not the third party who simply receives the information. This is the situation that arose in another case relied upon by Cloud & Tidwell. See Meadows v. Franklin Collection Serv. Inc., 2010 WL 2605048 *3 (N.D. Ala. June 25, 2010), reversed on other grounds by Meadows v. Franklin Collection Serv. Inc., 414 Fed. Appx. 230 (11th Cir. 2011). Similarly, defendant cites Deuel v. Santander Consumer USA, Inc., 700 F. Supp. 2d 1306 (S.D. Fla. 2010), for the proposition that a person who does not owe the debt has no standing. Again, however, the defendant relies upon a case in which the person who received the calls about a debt sought remedy under § 1692c(b) for communicating debt information to a third party. Another case relied upon by defendant, Frazer v. IPM Corp. of Brevard, Inc., 767 F. Supp. 2d 1369, also is unpersuasive in that it was premised on violations of § 1692c(a)(2), complaining that the debt collector contacted her directly instead of through her attorney. In Frazer, the plaintiff was not the consumer because she was not allegedly obligated to pay the debt incurred by the company she owned; furthermore, the debt was not a consumer debt covered by the FDCPA because it was a commercial debt. None of the cases cited by the defendant hold that a plaintiff who writes a cease-and-desist letter, but is repeatedly called thereafter, does not have standing to bring a claim pursuant to § 1692c(c).

In this case, brought pursuant to §§ 1692c(c) and 1692e(11), the Isaacs had informed the defendant that they did not owe the debt and had written a letter asking that the defendant cease and desist calling them.  Notwithstanding that notification, Cloud & Tidwell resumed calling the plaintiffs' telephone.  Unlike the court in <u>Stinson</u>, this court does not believe that the definition of "consumer" is limited only to those *actually* owing a debt.  By the statute's plain language, it also extends to those "alleged" to owe a debt, even if, in fact, they owe nothing.  It is not unreasonable for a person, who continues to receive calls after notifying a debt collector that he does not owe the debt, to conclude that the debt collector *alleges* that he owes a debt, therefore meeting the definition of "consumer" in the statute.  This court, like others examining the purpose of the FDCPA, finds that the intent of the law compels a more liberal application of its protections to the public.  In <u>McDermott v. Randall S. Miller & Assocs. P.C.</u>, 835 F. Supp. 362 (E.D. Mich. 2011), the court noted:

> In addition, the Court concludes that not extending [the <u>Kaniewski</u>] line of cases to claims under § 1692d and § 1692g is supported by the FDCPA's broad purpose of eliminating abusive debt collection practices and the legislative history of the FDCPA. H.R. Rep. No. 131, 95th Cong. 1st Sess. 8 ("This bill also protects people who do not owe money at all. In the collector's zeal, collection effort[s] are often aimed at the wrong person either because of mistaken identity or mistaken facts. This bill will make collectors behave responsibly towards people with whom they deal ...").

835 F. Supp. at 372-73.   A decision reached by another court within the Eleventh Circuit provided a remedy for a Florida couple who brought an FDCPA claim pursuant to § 1692c(c), finding they were "consumers" even though the debt collector had called them about a debt owed to a dentist they had never seen and who practiced in a state where they had never lived.  <u>Bishop v. I.C. System, Inc.</u>, 713 F. Supp. 2d 1361 (M.D. Fla. 2010).  Although the debt collector in <u>Bishop</u> did not dispute that both plaintiffs were "consumers," the defendant argued a hyper-

technical application of the statue, arguing that the Bishops' letter did not literally tell the debt collector to "cease further communication." 713 F. Supp. 2d at 1368. The plaintiffs in Bishop informed the debt collector that they had paid "every penny that [they] legitimately owe[d], which is nothing." 713 F. Supp. 2d at 1368. The court had no problem finding that the Bishops were "consumers" under the statute.

Defining the term "consumer" broadly, and interpreting the statute liberally to provide safeguards to those mistakenly targeted by a debt collector, more adequately serves the stated congressional purpose of the FDCPA, to "protect the public." See Bishop, 713 F. Supp. 2d at 1368. Providing a remedy to those wrongly contacted about a debt also serves the plain language of the FDCPA's definition of a "consumer" as one who is obligated or "allegedly obligated" to pay a debt. 15 U.S.C. § 1692a(3). A person can logically presume, when hounded by a debt collector, that the debt collector is *alleging* that he is *obligated* to pay the debt. As defendant's witness Brian Cloud testified, it would be a waste of time and resources for a debt collector to call someone from whom they did not think they could collect payment.[8]

The court finds that the plaintiffs meet the definition of being "consumers" for purposes of both § 1692c(c) and § 1692e(11) because, notwithstanding successfully notifying Cloud & Tidwell that they did not owe any debt to any client of Cloud & Tidwell, the defendant's resumed calling them at a telephone number the defendant knew (had received notice of) belonged to the Isaacs. The resumption of calls to them, after they notified defendant they did not owe anything, unmistakably communicated to them that Cloud & Tidwell believed and

---

[8] The court finds unconvincing the suggestion that receiving phone calls that violate the letter and the spirit of the FDCPA is simply not bothersome if the person receiving the calls knows he or she does not owe the debt. As the court in Bishop observed, it is even more frustrating and harassing to be called and accused of owing a debt one does not owe.

alleged that their telephone number was the debtor's correct contact number.[9]  Being alleged to owe a debt is enough to be a consumer under the FDCPA.

Because the FDCPA is broadly designed to provide a remedy to "any person" who is harmed by a violation of the Act, and because Cloud & Tidwell proceeded as if they alleged that the Isaacs were obligated to pay, the Isaacs have demonstrated that they fall within the definition of "consumers" entitled to a remedy under the FDCPA.  Accordingly, the court finds that the Isaacs have standing to raise the FDCPA claims asserted here and that they have not failed to prove that element of their claims.  The motions for judgment as a matter of law (docs. 107, 108) are due to be denied.

### B.  Prima Facie Case

Whether the plaintiffs have established a *prima facie* showing of liability under § 1692c(c) and § 1692e(11) is not disputed.  Indeed, the defendant stipulated that it called the plaintiffs' home more than forty times after receiving the Isaacs' cease-and-desist letter on August 1, 2011, and that the voice message left on their telephone on February 16, 2012, failed to include the required disclosure that it was from a debt collector for debt collection purposes. Even without the stipulation, the court has found these facts as described above based on the evidence submitted by the parties.  The defense of the case on its merits centers not on a lack of proof by the plaintiffs, but on the assertion that these events were *bona fide* errors excused by § 1692k(c).  The burden of proof on this defense lies with the defendant.

---

[9]   Although it is true that defendant never explicitly alleged that the persons known as "Albert and Rosetta Isaac" owed a debt, the key fact is that defendant resumed calling the Isaacs' telephone after being informed that the Isaacs owed nothing.  The fact that Cloud & Tidwell resumed calling the Isaacs' telephone number, after it was told that the number did not belong to the debtor it sought but to the Isaacs, implies that Cloud & Tidwell *alleged* that the Isaacs owed a debt.  Cloud & Tidwell would have had no reason to call a number it knew belonged to the Isaacs, unless it alleged that they were obligated to pay a debt.  The court will address the *bona fide* error argument below.

### C.  Bona Fide Error Defense

Section 1692k(c) states:

The debt collector may not be held liable in any action brought under this subchapter if the debt collector shows by a preponderance of the evidence that the violation was not intentional and resulted from a bona fide error notwithstanding the maintenance of procedures reasonably adapted to avoid any such error.

Courts have construed this provision to require three elements of proof the defendant debt collector must show by a preponderance of the evidence: (1) that the act constituting a violation of the FDCPA was not intentional, (2) that it resulted from a *bona fide* error, and (3) that there existed procedures reasonably adapted to prevent the error that failed to do so.  See Owen v. I.C. Sys., Inc., 629 F.3d 1263, 1271 (11th Cir. 2011), quoting Edwards v. Niagara Credit Solutions, Inc., 584 F.3d 1350, 1352-53 (11th Cir. 2009).

The court addressed Cloud & Tidwell's assertion of the "*bona fide* error" defense at length in its Memorandum Opinion denying summary judgment, finding that the undisputed evidence viewed favorably to the plaintiffs failed to demonstrate that the defendant's procedures were "reasonably adapted" to prevent the mistakes of leaving a message without identification as a debt collector and calling after receiving a cease-and-desist letter.  At trial, Cloud & Tidwell's story simply changed from "the letter was misplaced" to "the creditor made me do it."  In an affidavit supporting summary judgment, Brian Cloud testified that the Isaacs' cease-and-desist letter was received by him, but inadvertently misplaced by an employee.  At trial, however, Cloud testified that calls to the plaintiffs resumed because the creditor sent a duplicate collection account to Cloud & Tidwell, who failed to detect that the telephone number for the debtor was the same one identified in the Isaacs' letter received on August 1, 2011.  There is no explanation for the change in the testimony of Brian Cloud, and the court is left to conclude that Cloud filed a

summary judgment affidavit based on mere speculation, which he later discovered was not true.[10]

The evidence at trial does not persuade the court that Cloud & Tidwell is entitled to prevail on the *bona fide* error defense.  Although the court finds that Cloud & Tidwell did not *intend* to contact the Isaacs when the calls resumed in January 2012 (defendant believed it was attempting to contact Elva Whitman), and that the calls occurred due to an error in tracking the telephone number the Isaacs had notified the defendant not to call, the defendant did not prove by a preponderance of the evidence that its procedures for tracking numbers previously placed on a "do not call" list were reasonably adapted to prevent the error of such a number being placed in the system as part of a duplicate account.  Defendant admitted that the automated dialer used at the time did not have a readily available way of cross-checking telephone numbers against a list of "do not call" numbers, although that capability did exist and is now used by defendant in a different automated dialer system.

The evidence at trial established that Cloud & Tidwell used an automated dialer knows as Livevox.  When new collection accounts came into the firm, the accounts were "scrubbed" by a mail vendor to determine whether the contact information associated with the account matched public databases dealing with forwarding addresses, deaths, and bankruptcy filings.  After being "scrubbed," the mail vendor mailed an initial debt collection letter to the debtor, directing the debtor to contact the defendant.  Hence, in this case, in July 2011, the collection account for Elva Whitman was "scrubbed" to determine whether there were any forwarding addresses associated with the address in the account, whether Elva Whitman was listed as deceased by the Social Security Administration, and whether Elva Whitman had filed any bankruptcy petitions.

---

[10]   The only alternative explanation is that Cloud decided simply to change his testimony after concluding that the "lost letter" explanation would not work.

Thereafter, the mail vendor mailed a letter addressed to Elva Whitman at the address associated with the account. This letter, of course, did not go the Isaacs. The telephone numbers associated with Elva Whitman (supplied by the creditor) were programmed into Cloud & Tidwell's automated dialer to begin making calls to Elva Whitman. One of those numbers belonged to the Isaacs.

The Issacs began receiving automated calls in late July 2011. For whatever reason,[11] the automated dialer invariably terminated the calls made to the Isaacs, never connecting Mr. or Mrs. Isaac to a live collection caller. On July 29, 2011, the Isaacs wrote a letter to Cloud & Tidwell notifying defendant that they did not owe a debt to defendant or its clients and instructing defendant not to call their telephone number. Defendant admits it received the letter on August 1, and that no more calls were made to the Isaacs after August 4, when their number was added to a "do not call" list maintained by Cloud & Tidwell.

Defendant's procedures for avoiding calling wrong numbers or mistaken numbers were reasonable to this point. Cloud & Tidwell had no way of knowing that the telephone number supplied by the creditor belonged to the Isaacs until it received their letter on August 1. Thereafter, Cloud & Tidwell promptly placed the number on a "do not call" list and calls to the Isaacs ceased on August 4. Because defendant had procedures reasonably adapted to deal with

---

[11]   Cloud & Tidwell contends that the hang-up calls were caused by Mr. Isaac's unusual way of answering the telephone, which caused the automated dialer to conclude that it had reached an answering machine or voice mail. The automated dialer software was programmed to look for a short greeting (such as "Hello") followed by a pause. If the pause did not occur quickly, the software associated a longer greeting with voice mail or answering machine instructions for leaving a message, causing the dialer to terminate the call. Defendant contends that Mr. Isaac used a longer than usual greeting, saying something like, "This call is being recorded. How may I help you?," which the automated dialer took to be a voice mail or answering machine greeting.

wrong numbers, any calls made through August 4 were nothing more than *bona fide* errors corrected as soon as discovered.

In January 2012, however, the creditor that forwarded the Elva Whitman collection account to defendant in July 2011, forwarded the *same* collection account to Cloud & Tidwell a second time.  The collection account on Elva Whitman received in January 2012 was an exact duplicate of the account received and scrubbed in July 2011 --- the same creditor, the same debtor, the same debt, and the same contact information.  The January account underwent the same "scrubbing" as it had in July 2011, but the telephone numbers associated with the account were not cross-checked against the "do not call" list on which the Isaacs' number had been placed.  There also is no evidence of any procedure by which Cloud & Tidwell would attempt to determine whether collection accounts received by it were mere duplicates of accounts received earlier.  If defendant had attempted to cross-check the January account against earlier collection accounts, it would have discovered that the January account was an exact duplicate of the earlier July account on which Cloud & Tidwell had received the cease-and-desist letter from the Isaacs. That did not occur.

Defendant admits that software technology was and is available through which an automated dialer can cross-check programmed telephone numbers against a "do not call" list, in order to prevent the dialer from calling the numbers on the "do not call" list.  The automated dialer used by defendant in 2011 and 2012 (Livevox) did not have ready access to such a feature.[12]  As a result, Cloud & Tidwell resumed making calls to the Isaacs' telephone number even though it had received their letter and had properly and promptly processed it by placing

---

[12] It is unclear to the court whether Cloud & Tidwell's evidence on this point was that Livebox did not have the cross-checking feature, or that the feature existed but was difficult to access.  In either event, it was not used and Cloud & Tidwell acknowledged that other automated dialers had the feature and, in fact, defendant now uses a different dialer with the feature.

their number on a "do not call" list.  Unfortunately, when the Isaacs' number was included in the duplicate collection account for Elva Whitman months later, defendant had no procedures in place to detect that a telephone number in the account was already on a "do not call" list.  Hence, the defendant has not shown that it maintained procedures "reasonably adapted" to prevent the error of calling a telephone number it was on notice not to call.  A simple computerized cross-check of telephone numbers in a collection account against numbers already on a "do not call" list would have prevented the erroneous resumption of calls to the Isaacs, or at least would have prompted further investigation.

The court reaches the same conclusion with respect to the voice message left on the Isaacs' answering machine on February 16, 2012.  Although Cloud & Tidwell offered evidence that it trains its employees thoroughly on their obligations under the FDCPA, it is undisputed that an employee left a voice mail or answering machine message at the Isaacs' telephone number without making the required debt collector disclosures under § 1692e(11).  Plainly, the employee leaving the message did so *intentionally* in the sense that he knew he was leaving a message and that it did not contain the disclosures.  Cloud & Tidwell argue that the message was a *bona fide* error because the FDCPA has conflicting provisions which, on the one hand, require a debt collector to disclose that he is a debt collector, but, on the other, preclude disclosing to third-parties that a consumer owes a debt.  Defendant contends that it could not leave the message without violating one or the other of these provisions.

The Eleventh Circuit had already rejected this argument at the time of the events in this case.  The court of appeals examined the requirements of § 1692e(11) in the context of a message left on an answering machines in Edwards v. Niagara Credit Solutions, Inc., 584 F.3d 1350 (11th Cir. 2009).  In Edwards, a debt collector seeking the safety of the *bona fide* error

exception argued that it intentionally left out of its message that it was a debt collector seeking to collect a debt because the message might be heard by a third party, which would run afoul of another section of the FDCPA.  584 F.3d at 1351, citing 15 U.S.C. § 1692c(b).  Nothing in the FDCPA, the court of appeals explained, gives a debt collector the right to leave a voicemail message, or exempts a debt collector from making the requisite disclosures if a message is left.  584 F.3d at 1354.  Other courts have examined whether telephone calls from a debt collector were intended to harass or deceive the consumer when the debt collector chose *not* to leave a message when an answering machine is reached, and have found nothing "harassing, oppressive, or abusive" about the practice.  Udell v. Kansas Counselors, Inc., 313 F. Supp. 2d 1135, 1143-44 (D. Kan. 2004).  Thus, when a debt collector's call is answered by an answering machine or voice mail, the collector can elect to leave no message at all, see Udell, *supra*, or leave a message with the required disclosures, see Edwards, *supra*.  He may not leave a message lacking the required disclosures.

In any event, the argument that conflicting provisions of the FDCPA created an error raises nothing more than an error of law, a misinterpretation of the law, which is not an error that can excuse an apparent violation of the Act.  The Supreme Court has held unambiguously that "the bona fide error defense in § 1692k(c) does not apply to a violation of the FDCPA resulting from a debt collector's incorrect interpretation of the requirements of that statute."  Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA, 559 U.S. 573, 604-05, 130 S. Ct. 1605, 1624, 176 L. Ed. 2d 519 (2010).  Mistakes of law, as opposed to mistakes of fact, cannot constitute a *bona fide* error under § 1692k(c).  Consequently, the *bona fide* error defense does not apply to the defendant's confusion over whether voice messages without the required disclosures are legal.

28

### D. Damages

Having concluded that the plaintiffs are entitled to recover from the defendant for two violations of the FDCPA, the court must determine the damages to which they are entitled.  As applicable to this case, 15 U.S.C. § 1692k(a) provides for the recovery of damages by a successful plaintiff as follows:

> Except as otherwise provided by this section, any debt collector who fails to comply with any provision of this subchapter with respect to any person is liable to such person in an amount equal to the sum of—
>
> (1) any actual damage sustained by such person as a result of such failure;
>
> (2)(A) in the case of any action by an individual, such additional damages as the court may allow, but not exceeding $1,000; or ….

15 U.S.C. § 1692k(a) (inapplicable provisions omitted).  Actual damages under the statute include emotional distress.  "Actual damages under the FDCPA include damages for emotional distress."  Minnifield v. Johnson & Freedman, LLC, 448 F. App'x 914, 916-17 (11th Cir. 2011), citing Johnson v. Eaton, 80 F.3d 148, 152 (5th Cir.1996) (noting that the FDCPA not only requires that the debt collector compensate the debtor for any monetary damages, but also for "emotional distress or other injury that the debtors can prove the debt collector caused."). Statutory "additional damages" in the amount of $1,000.00 is capped in that amount for each "action," not each violation.  See Harper v. Better Business Services, Inc., 961 F.2d 1561, 1563 (11th Cir. 1992); Latimore v. Gateway Retrieval, LLC, 2013 WL 791258 (N.D. Ga. Feb. 1, 2013) report and recommendation adopted, 2013 WL 791308 (N.D. Ga. Mar. 4, 2013).  Punitive damages, if appropriate, are included in the additional statutory damages and are also capped at $1,000.00.  See Latimore, supra, *13 note 8 ("To the extent that Plaintiff may be seeking punitive damages pursuant to the FDCPA, such damages fall within the statutory damages to be

awarded and are capped at $1,000."); see also Thomas v. Pierce, Hamilton, and Stern, Inc., 967 F.Supp. 507, 512 (N.D.Ga.1997) ("the court [found] that punitive damages in excess of $1,000.00 are not recoverable under the [FDCPA]"); accord Lee v. Security Check, LLC, 2009 WL 2044687, *2 (M.D. Fla. July 10, 2009).

The evidence at trial established that Mr. Isaac suffers from diabetes and that the stress and anger caused by the telephone calls from the defendant, particularly because they were almost always hang-up calls, caused his blood sugar to rise above healthy levels. This required him to exercise more to calm himself and restore a proper blood-glucose balance. Although there is no evidence that Mr. Isaac suffered any permanent injury, his emotional upset at receiving the calls exacerbated his diabetes, making him temporarily ill. The actual damages also include emotional injury manifested in the frustration he experienced. Despite having informed the defendant that he did not owe them anything and not to call his telephone, the calls kept coming. Therefore, because Mr. Isaac suffered both emotional distress and physical illness caused by the calls made to his home after he told the defendant to cease calling, he suffered actual damages for which he is entitled to recover monetary damages. Balancing the physical and emotional nature of the injury and the relatively short of period of time it lasted, the court finds that Mr. Isaac is entitled to recover $2,500.00 in actual damages.

The court also finds that the plaintiffs jointly are entitled to recover statutory "additional damages" of $1,000.00. Although both Mr. and Mrs. Isaac have sued, the court concludes that there is only one action with a maximum statutory-damage recovery of $1,000.00 for both plaintiffs. Under § 1692c(d), the "term 'consumer' includes the consumer's spouse…." Thus, a husband and wife are regarded as one "consumer" for purposes of recovery of the statutory maximum. Because the plaintiffs filed and prosecuted this action *pro se*, they are not entitled to

recover any attorney's fees, but they are entitled to "the costs of the action."   15 U.S.C.
§ 1692k(a)(3).


### III.  Conclusion

In sum, therefore, the plaintiffs are entitled to recover from the defendant a total of
$3,500.00 in actual and statutory damages, plus the costs of the action.  A separate judgment will
be entered.

DATED this 17th day of July, 2014.


_____
T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE